CHECKED
BY DOCKET

NOV 9 2005

D. LUKEZ

7005 OCT 28 A II: 23

GERALD E. FUERST
CLERK OF COURTS
CUYAHOGA COUNTY

**IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO**

| | |
|---|---|
| SOUTH LORAIN MERCHANTS ASSOCIATION ) <br> HEALTH & WELFARE BENEFIT PLAN ) <br> (dba "CARDINAL HEALTH PLAN") ) <br> 222 S. Main Street ) <br> Akron, Ohio 44318 ) | CASE NO. <br><br> CV 05 575959    Complaint <br> 36310661 <br><br> JUDGE |

         and              )

COMMERCE GROUP SOUTHEAST     )
5151 Brook Hollow Parkway, Suite 130  )
Norcross, Georgia 30071         )

         and              )

COMMERCE BENEFITS GROUP AGENCY,  )   **COMPLAINT FOR**
INC.                           )   **DAMAGES AND**
33479 Lake Road              )   **INJUNCTIVE RELIEF**
Avon Lake, Ohio 44012         )

            Plaintiffs,    )

          -v-            )   **JURY TRIAL DEMANDED**

DANIEL FEDELI            )
c/o THE FEDELI GROUP       )
5005 Rockside Road          )
Independence, Ohio 44131     )

         and              )

THE FEDELI GROUP          )
5005 Rockside Road          )
Independence, Ohio 44131     )

         and              )

$ /00.00   DEPOSITED

OCT 28 2005

SECURE COSTS
GERALD E. FUERST Clerk of Courts
PER _____ DEPUTY

CV05575959           36341205

MEDICAL MUTUAL OF OHIO          )
2060 E. 9th Street              )
Cleveland, Ohio  44115          )
                                )
              Defendants.       )

Now come the Plaintiffs and for their Complaint make the following allegations:

## PARTIES; MARKETS

1.     Plaintiff South Lorain Merchants Association Health & Welfare Benefit Plan dba Cardinal Health Plan ("Cardinal") is a tax-exempt, Ohio-licensed Multiple Employer Welfare Arrangement ("MEWA"), regulated by the Ohio Department of Insurance; Cardinal was organized in 1982, so that small employer businesses could collectively provide quality, cost-effective health and welfare benefits, through the MEWA, to their employees.

2.     Cardinal provides benefits for over 15,000 lives of employees and their families from over 600 employers in its geographic area; those benefits consist of self-insured health care benefits, plus associated stop-loss insurance (the "Product Market").

3.     Cardinal's health care benefits are administered by Plaintiffs Commerce Group Southeast, a Georgia corporation, and its Ohio affiliate, Commerce Benefits Group Agency, Inc., an Ohio corporation, licensed by the State of Ohio, and regulated by the Ohio Department of Insurance (collectively, "CBG"), which provide Third Party Administration ("TPA") services to Cardinal, including claims processing, claims auditing, claims management and related services.

4.     Defendant Daniel Fedeli ("Fedeli") is a an insurance broker/agent, employed by Defendant The Fedeli Group ("FG"), which is a multi-line provider of

- 2 -

insurance services, including health insurance coverage, and which is owned by Fedeli's brother Umberto Fedeli ("UF"); all of Fedeli's activities complained of in this Complaint were in the course and scope of his employment by FG, which is legally responsible for same.

5.      Defendant Medical Mutual of Ohio ("MMO") is Ohio's oldest and largest health insurer, whose Northern Ohio customer base is so large it has negotiated significant discounts with health care providers in its network ("MMO Network"), which it makes available to its own customers, as well as to others through exclusive contractual marketing relationships solely offered through FG or Devon Health ("Devon"); at least at the outset, Defendant MMO would not contract with any Lorain County TPA, thus Plaintiff CGB was required to contract through Devon (this geographic limitation was subsequently lifted by MMO)..

6.      Because of the vast scope of doctors and hospitals within the MMO Network, the level of discounts such network enjoys, and the fact that competing networks (e.g., those offered by United Health, Aetna, Anthem, etc.) do not sell or lease their networks to others, the MMO Network is a unique and exclusive enterprise and/or facility within the marketplace served by Plaintiff Cardinal, which consists of Lorain County, Ohio and adjacent portions of contiguous counties (the "Geographic Market"): duplication of the MMO Network would, in any event, be economically infeasible and denial of its use inflicts a severe handicap on potential market entrants.

## FACTS

7.     Fedeli and/or FG are associate members of the Ohio Health Care Association ("OHCA"), a non-profit trade association whose nearly 800 regular member nursing homes and similar facilities receive from it numerous services, including data on the product and service offerings made available by its associate members.

8.     OHCA sought for several years to locate a suitable alternative offering for health care benefits for its members, because many believed traditional insured products were too expensive or otherwise inappropriate for their needs.

9.     At the recommendation of Benefit Design Agency ("BDA"), an independent insurance consultant, OHCA, reached agreements with Plaintiff Cardinal and Plaintiff CBG to provide such alternative, including self-funded health insurance benefits plus associated stop-loss insurance.

10.     In order for Plaintiff Cardinal to provide such benefits, it contracted, directly or indirectly through Plaintiff CBG, for access to the MMO Network (copies of such contracts are appended hereto as Exhibits 1 and 2), and such contracts were routinely renewed on an annual basis for 5 years.

11.     Fedeli and FG learned of the foregoing arrangements after OHCA announced them to its members and after Plaintiff CBG successfully competed against Fedeli and FG for a nursing home customer in Avon, Ohio, which had previously been serviced by Fedeli and FG's more traditional insurance carrier-based offerings.

12.     In 2004, Fedeli called the OHCA and learned the details of the arrangements between Plaintiffs and Defendant MMO, which existed by way of the

contracts between Plaintiffs and Defendant MMO; OHCA offered Fedeli and FG the opportunity to market Plaintiff Cardinal's MEWA to its members.

13.     Rejecting that offer, Fedeli "warned" OHCA not to do business with Plaintiffs, unfairly mischaracterizing and disparaging their business practices and ethics, and by making other unfounded slurs against the character and reputation of one of the owners of Plaintiff CBG; when requested by OHCA to articulate a sound business reason, Fedeli was unable to do so, preferring instead to repeat and increase his invective.

14.     OHCA verified with BDA and others the falsity of the foregoing commentary and refused to cause or recommend the termination of Plaintiffs' arrangements with MMO.

15.     Defendant Fedeli then told OHCA that, his brother UF, through his brother's and FG's close relationship with MMO's CEO Kent Clapp ("Clapp"), would cause the "mistaken nature" of the contracts to be called to Clapp's attention; later Fedeli told OHCA that when Fedeli called UF, UF was in fact meeting with Clapp, and Fedeli spoke directly with Clapp at UF's direction.

16.     Shortly thereafter, MMO issued a notice terminating its contractual MMO Network relationships with Plaintiffs, ostensibly because Plaintiff CGB was failing to meet a "quota," when no such quota ever existed as part of the parties' contractual undertakings.

17.     After BDA attempted to restore the terminated relationships, BDA's executives informed OHCA that Defendant MMO's decision came "from the top," was "irrevocable" and that OHCA should "leave it alone."

18.     Although Cardinal's members have a two-year wind-down respecting use of the MMO Network, during and after that time, they will have no choice but to access said network by contracting through Fedeli and the FG if they are to maintain their access to such unique and essential facility.

### CAUSES OF ACTION
### COUNT I
### Tortious Interference

19.     Plaintiffs incorporate herein paragraphs 1-18 as if fully restated.

20.     Defendants Fedeli and FG have, without privilege, knowingly, maliciously and consciously interfered with and thwarted the existing contracts, prospective contracts, existing and prospective advantageous business relations, and reasonable future business expectations of Plaintiffs with MMO.

21.     As a consequence, Plaintiffs have lost and will lose business, revenue, profits, reasonable expectations of future business and other legitimate business benefits.

### COUNT II
### UDPA

22.     Plaintiffs incorporate herein paragraphs 1-21 as if fully restated.

23.     Defendants Fedeli and FG have violated ORC §§ 4165.02 and 4165.03, the Unfair and Deceptive Practices Act ("UDPA") and associated regulations promulgated thereunder by the Ohio Department of Insurance.

24.     As a consequence, Plaintiffs have lost and will lose business, revenue, profits, reasonable expectations of future business and other legitimate business benefits.

## COUNT III
### Business Disparagement; Defamation

25.     Plaintiffs incorporate herein paragraphs 1-24 as if fully restated.

26.     Defendants Fedeli and FG have knowingly, maliciously, willfully and consciously falsely disparaged the business and personal reputations and character of Plaintiffs.

27.     As a consequence, Plaintiffs have lost and will lose business, revenue, profits, reasonable expectations of future business and other legitimate business benefits.

## COUNT IV
### Antitrust

28.     Plaintiffs incorporate herein paragraphs 1-27 as if fully restated.

29.     In violation of Sections 1 and 2 of the Sherman Act, 15 USCS §§1 and 2, and Ohio's Valentine Act, ORC §§ 1331.01 et seq., Defendants Fedeli, FG and MMO, and Devon, have entered into a "contract, combination and conspiracy in restraint of trade" to (a) unlawfully allocate markets, (b) engage in unlawful exclusive dealing and illegally deprive Plaintiffs of access to a unique and essential facility, (c) suppress price and product competition and thus (d) deprive Plaintiffs the critical source of supply, the MMO Network, which constitutes a monopoly under the facts of this case.

30.     As a consequence, Plaintiffs have lost and will lose business, revenue, profits, reasonable expectations of future business and other legitimate business benefits; in addition to appropriate injunctive relief, Plaintiffs are entitled to treble damages under the Sherman Act, 15 USCS §§ 1 and 2, Section 4 of the Clayton Act, 15 USCS § 15 and Ohio's Valentine Act, ORC §§ 1331.01 et seq.

- 7 -

## COUNT V
### Conspiracy

31.     Plaintiffs incorporate herein paragraphs 1-30 as if fully restated.

32.     Defendants Fedeli and FG, on the one hand, and MMO, or the other, have conspired unlawfully with each other, and with Devon, to engage in the conduct complained of in each of the other Counts of the Complaint, in violation of common law and Section 2 of the Sherman Act, 15 USCS § 2.

33.     As a consequence, Plaintiffs have lost and will lose business, revenue, profits, reasonable expectations of future business and other legitimate business benefits.

## COUNT VI
### Injunctive Relief

34.     Plaintiffs incorporate herein paragraphs 1-33 as if fully restated.

35.     Plaintiffs have no adequate remedy at law.

36.     Plaintiffs are entitled to injunctive relief under Ohio common law, Ohio's Valentine Act, ORC §§ 1331.01 et seq., the Sherman Act, 15 USCS §§ 1 and 2, and Section 16 of the Clayton Act, 15 USCS § 26.

## PRAYER

37.     Wherefore, Plaintiffs demand, after trial by jury on all issues so triable,

and after appropriate hearings on forthcoming motions for preliminary and permanent

injunction,

A.     Damages on Counts I, II, III and IV and treble damages on
Counts IV and V, in amounts to be determined at trial,

B.     Preliminary and Permanent Injunctions, as appropriate, on
all Counts.

C.     Attorneys fees, costs and such other and further relief at
Law or in Equity to which they may be entitled.

Respectfully submitted,

Robert P. DeMarco (0031530)
30505 Bainbridge Road, Suite 225
Solon, Ohio 44139
T:  (440) 248-8811
F:  (440) 248-1599
E-mail:  rpdatty@juno.com

Kenneth F. Seminatore (0011461)
1715 The Superior Building
815 Superior Avenue
Cleveland, Ohio 44114
T:  (216) 344-3838
F:  (216) 344-0515
E-mail:  kensemlaw@aol.com

Attorneys for Plaintiffs

## **JURY DEMAND**

Plaintiffs demand trial by Jury in the maximum number permitted by law on all issues properly so triable.

Robert P. DeMarco

Kenneth F. Seminatore

Attorney for Plaintiffs



## NETWORK ACCESS AGREEMENT

This Agreement is entered into by and between Medical Mutual of Ohio (MMO) with its principal offices at 2060 East Ninth Street, Cleveland, Ohio 44115 and Commerce Group South East (Client), with its principal offices at 5151 Brook Hollow Pkwy Ste. 130 Norcross, GA 30071

## R E C I T A L S

A.    MMO has created a network of health care providers (MMO's Network) by entering into agreements with hospitals, physicians, and ancillary and other facilities (MMO Providers) to provide health care services to cardholders and their dependents (Covered Persons) covered by health services benefit programs (Benefit Programs).

B.    A portion of the health care providers in MMO's Networks have entered into SuperMed contracts which provide for services to Covered Persons with SuperMed Benefit Programs based upon certain financial incentives (SuperMed Providers).

C.    Client issues and/or administers Benefit Programs for its Covered Persons. Client also may contract with other entities (Sub-Clients) which issue and/or administer Benefit Programs for their Covered Persons in which cases Client is a service provider to Sub-Clients rather than an ERISA fiduciary. Unless stated otherwise herein, all references to Client will include Sub-Clients.

D.    Client seeks access to MMO's Network as described herein.

## A G R E E M E N T

Section I.    Term

1.    This Agreement is effective as of __8|26|01__ .

2.    Unless terminated under Section V herein, this Agreement will remain in effect until __8/25/02__ and will be renewed automatically for successive one year terms without further action by either party, unless either party notifies the other party in writing, not less than ninety (90) days before any renewal date, of its intention not to renew this Agreement.


PLAINTIFF'S
EXHIBIT

Section II.    Obligations and Rights of MMO

1.    Network Recruitment and Contracting. MMO will recruit and contract with MMO Providers which MMO deems sufficient in number and distribution to provide health care services to Covered Persons in Ohio. MMO will generally contract directly with MMO Providers but may also contract with existing networks in certain circumstances whenever, in its sole discretion, MMO determines this to be preferable. MMO retains the right to modify, alter or amend provider fee schedules, payment rates and payment methodologies consistent with its provider contracts.

2.    Client Implementation Guide. MMO will issue a Client Implementation Guide (CIG) describing various network matters, and the CIG as amended from time to time, is incorporated into this Agreement in full.

3.    Credentialing. MMO will credential MMO Providers in a manner which, in MMO's sole and reasonable discretion, is consistent with good credentialing practices and procedures.

4.    Directories. MMO will provide Client with a reasonable quantity of printed directories of MMO Providers as specified in the CIG. Furthermore MMO will provide a toll free telephone number for use by Client and its Covered Persons to determine whether a provider is in MMO's Networks and will maintain an Internet site with a listing of MMO Providers.

5.    Claims Receipt and Pricing. MMO will receive directly from all Providers all claims with dates of service on or after the effective date for each Covered Person of Client or Sub-Client in either paper or electronic format. As more fully described in the CIG, MMO will return to Client instructions relating to pricing of such claims. In no event will MMO be responsible for paying any portion of any claim.

6.    Adjustments, Allowances. Incentives and Settlements. In certain cases, MMO may receive adjustments, allowances, incentives or settlements from MMO Providers relating to provider contract issues such as maximum charge increase violations, prompt payment discounts, or guaranteed discounts corridors. Such adjustments, allowances, incentives and settlements, other than those that accrue to a specific claim at the time of adjudication, shall be the sole property of MMO and shall not reduce or alter in any way the Access Fees paid by Client.

7.    Prohibition of Balance Billing. MMO's contracts with MMO Providers require those providers to refrain from balance billing Covered Persons except for copayments, coinsurance, deductibles and non-covered services consistent with the applicable

Benefit Programs. In the event that Client does not elect to have MMO apply its automated payment and medical necessity edits, the aforementioned hold harmless provisions of MMO's provider contracts will not limit billing by MMO Providers in case of medical necessity, or similar, medical policy determinations.

8.  Licenses and Registrations. MMO will maintain all licenses, registrations and other government approvals that may be required in connection with its obligations under this Agreement.

9.  Insurance. MMO will maintain commercial general liability coverage in the amount of One Million Dollars ($1,000,000.00).

10.  Runout. For a six month period MMO will price claims even after termination of any Sub-Client for claims with dates of service between the Sub-Client's effective date and the termination date. The Access Fee for such runout pricing is set forth in Exhibit A.

**Section III.    Obligations and Rights of Client**

1.  Sub-Clients. All Sub-Clients are subject to MMO's approval and must execute the form attached hereto as Exhibit A agreeing to be bound by the terms of this Agreement and such other terms as are set forth in Exhibit A.

2.  Eligibility. MMO will not have any responsibility for making any determinations regarding eligibility for and compensability of benefits in connection with this Agreement. The parties expect that Sub-Clients will make such determinations, and Client will communicate those determinations as appropriate. Client will forward to MMO eligibility data as more fully described in the CIG.

3.  Payment to Providers. Client will be solely responsible for processing all payments on behalf of Sub-Clients to providers for Covered Services rendered. All such payments must be made in accordance with applicable state and federal law and must be consistent with the pricing instructions supplied by MMO, except as provided in the CIG. If Client fails to process payment of a claim as required above, MMO may elect, at its sole discretion, to require Client to pay full charges to the MMO Provider or to suspend repricing of claims for the Sub-Clients involved. Client acknowledges and understands that the amount to be paid to MMO Providers may exceed the amount of charges for the services rendered.

4.  Notice of Payment. As set forth in the CIG, Client will issue a Notice of Payment (NOP) to each MMO Provider for each claim repriced under this Agreement.

5.  Identification Cards, Directories and Other Materials. Client will issue to all Covered Persons identification cards clearly showing MMO's name and logo provided that any use of MMO's name or logo must be in strict conformance with MMO's graphic standards as described in the Administrative Manual. Client will provide MMO with samples of identification cards for MMO approval. Furthermore, Client will distribute directories and/or MMO network locator information to Covered Persons in conformity with the CIG. Client may also issue other materials, such as marketing brochures, manuals or flyers, but Client must obtain prior approval from MMO before distributing any such materials containing MMO's name, marks or logos.

6.  Financial Incentives to Covered Persons. Client will require that all Sub-Clients provide Covered Persons with financial incentives to utilize SuperMed Providers. This financial incentive will be at least a ten percent (10%) difference in deductible, copayment or coinsurance such that the non-network out-of-pocket maximums encourage the use of MMO's Network. In case of any failure by Client to enforce these financial incentives, MMO may elect, at its sole discretion, to require Client to pay full charges to the MMO Provider.

7.  Access Fees. Client will pay to MMO all monthly access fees paid to it by Sub-Clients pursuant to Exhibit A. Such access fees will be paid within fifteen (15) days of the end of the month for which a fee is due. Interest of two percent (2%) per month will apply to late access fee payments. In addition, Client will pay MMO all expenses incurred by MMO in connection with collecting such fees, including attorney fees, irrespective of whether suit is filed. If Client fails to make timely payment of Access Fees, MMO, at its sole discretion, may suspend repricing until full payment is made by Client.

8.  Data Provision.

    a.  Upon request and at no charge, Client shall provide MMO, all information reasonably necessary to implement, operate, and evaluate the services provided pursuant to this Agreement including, but not limited to, the names and locations of all Sub-Clients accessing MMO's Networks or acting as payor pursuant to this Agreement, the number, and geographic distribution of all Covered Persons.

    b.  On a weekly basis, Client will provide MMO with a disbursements file in EDI format (in the form specified in the

CIG), or other mutually agreeable format, as and when requested by MMO.

c.    Upon request and at no charge, Client will provide MMO with a status report as to any claim(s) processed under this Agreement.

9.    Communication with MMO Providers. With respect to Sub-Clients accessing MMO's Network, Client will not solicit, nor allow any third party on its behalf to solicit, any MMO Providers to contract with Client or to otherwise provide health care services to Covered Persons during the term of this Agreement and for a period of two years thereafter. Furthermore, Client will not communicate with MMO Providers for any purpose related to pricing of claims nor have any third party do so. Client will assist MMO in resolving issues with MMO Providers as requested by MMO.

10.   Licenses and Registrations. Client will maintain all licenses, registrations and other government approvals that may be required in connection with its obligations under this Agreement.

11.   Exclusive Network. Client will not use any other network in Ohio for Sub-Clients utilizing the MMO Network without prior written approval from MMO.

Section IV.   Mutual Obligations and Rights of the Parties

1.    Records and Audit. Each party shall maintain complete and accurate records in connection with this Agreement. Subject to confidentiality provisions contained herein, each party will have the right, upon ten business days' written notice, during normal business hours and at no charge, to perform one audit in each contract year of such records of the other party to confirm the performance of the obligations imposed by this Agreement. The auditing party shall provide the other with a copy of its audit report. The rights set forth in this provision shall survive the termination of this Agreement for one year.

2.    Confidentiality. The parties agree to hold all information provided by one party to the other exchanged in contemplation of, or in connection with duties under this Agreement, confidential for the term of this Agreement, and for five years thereafter, and shall not disclose such information to any third party except as required to implement this Agreement, as required by law or regulation, or with the prior written permission of the other party. Nothing herein will be construed to prohibit Client's disclosure of aggregate payment and utilization data to any existing or prospective

insurer or third-party administrator for the purpose of facilitating a proposal from such insurer or TPA to insure or administer Client's health benefits.

3.  Cross Indemnification. Each party shall indemnify and hold the other, including its officers, trustees, directors, cardholders, agents, successors and assigns, harmless from and against all claims, liability, loss, damages, and expenses, including reasonable attorneys' fees, which may be alleged against or incurred by the other party and which are the result of breach of this Agreement or proximately caused by the negligent omission or commission of the indemnifying party in connection with any obligation set forth in this Agreement.

4.  Non-Compete. During the term of this Agreement and for one year thereafter neither party will solicit or contract with the customers of the other party, including groups and other employers offering health service benefit programs and persons covered by such programs of the other party. This provision will not apply to the non-breaching party in the event of a termination pursuant to Section V, paragraph 4. Additionally this provision will not apply to formal bid processes with customers or potential customers.

Section V.  Termination. Notwithstanding any other provision in this Agreement:

1.  If Client does not make payment of the Access Fee in accordance with Section III (7) and is in arrears more than thirty (30) days, MMO may terminate this Agreement upon written notice.

2.  In the event that Client fails to make payment to MMO Providers as required herein, MMO may terminate this Agreement upon written notice.

3.  In the event of a merger, consolidation, sale or other transfer of substantially all of the assets of either party or any other change in control of either party, the other party may terminate this Agreement upon written notice.

4.  In the event of a material breach of its obligations under this Agreement (other than a breach relating to payment as described in Section V(1) and (2) above), the non-breaching party shall give the breaching party thirty (30) days to cure. In the event the breaching party fails to cure the breach within the thirty (30) day period, this Agreement may be terminated by the non-breaching party upon sixty (60) days written notice.

5.  If either party becomes insolvent, is adjudicated as bankrupt, makes a general assignment for the benefit of creditors or comes under the control of a trustee in bankruptcy, this Agreement will automatically terminate.

6.  In the event of a termination, each party will promptly pay to the other any money due under this Agreement. Client promptly will notify Sub-Client to advise Covered Persons of the termination of this Agreement, and require that Sub-Clients withdraw from Covered Persons all identification cards bearing MMO's name and logo. Client also will immediately cease to otherwise use MMO's name and logo.

## Section VI.   Miscellaneous

1.  <u>Notices</u>. Any notice required pursuant to this Agreement must be in writing and sent by registered or certified mail, return receipt requested, by facsimile transmission with proof of delivery, or by nationally recognized private overnight courier with proof of delivery, to the addresses of the parties set forth below. The date of notice will be the date on which the recipient receives notice or refuses delivery. All notices will be addressed as follows or to such other address as a party may identify in a notice to the other party:

> to MMO:      Medical Mutual of Ohio
> 2060 East Ninth Street
> Cleveland, Ohio 44115
> Attn: General Counsel

> to Client:      Commerce Group South East
> 5151 Brook Hollow PKwy Ste. 130
> Norcross, GA 30071
> ATTN: Ric Formani

2.  <u>Relationship of the Parties</u>. The relationship between the parties is that of independent contractors. Nothing herein is intended or will be construed to establish any agency, employment, partnership or joint venture relationship between the parties. Each party will be solely responsible for the direction, control and management of its subcontractors, agents and employees.

3.  <u>Sole Beneficiaries</u>. Unless otherwise stated herein, this Agreement is entered into by and between MMO and Client solely for their benefit. The parties have not created or established any third party beneficiary status or rights in any person or entity not a party hereto including, but not limited to, any Covered Person, subcontractor, or

other third party, and no such third party will be entitled to enforce any right or enjoy any benefit created or established under this Agreement.

4.  <u>Amendments</u>. This Agreement may be amended only by mutual written agreement between the parties.

5.  <u>Governing Law and Jurisdiction</u>. This Agreement is made in, and will be governed by and construed in accordance with the laws of, the State of Ohio without regard to principles of conflict of law. The state and federal courts located in Ohio will have exclusive jurisdiction over both parties with respect to any dispute regarding this Agreement.

6.  <u>Assignment</u>. Neither party may assign this Agreement or any of its rights or obligations hereunder to any other person or entity without the prior written consent of the other party hereto, which consent will not be unreasonably withheld. This Agreement shall be binding upon and inure to the benefit of the respective parties and their successors and permitted assigns.

7.  <u>Entire Agreement</u>. This Agreement including any exhibits, attachments and amendments hereto, constitutes the entire agreement between the parties and supersedes any prior agreements or understandings, whether oral or written.

8.  <u>Headings</u>. The section and paragraph headings used herein are for convenience only and will not be deemed to limit, define or restrict the meaning or content thereof.

9.  <u>Waiver</u>. A waiver of a breach or default under this Agreement will not be a waiver of any other subsequent breach or default. A failure or delay in enforcing compliance with any term or condition of this Agreement will not constitute a waiver of such term or condition unless it is expressly waived in writing.

IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Agreement below.

MEDICAL MUTUAL OF OHIO

By: _____

Title: _Exec. V.P. + Corl. Secretary_

Date: _9/4/01_

CLIENT

By: _____

Title: _VP of Sales_

Date: _8/26/01_

## NETWORK ACCESS AGREEMENT

The parties to this agreement are Medical Mutual of Ohio ("MMO"), 2060 East Ninth Street, Cleveland, Ohio 44115, and South Lorain Merchants Association Health & Welfare Benefit Trust, dba Cardinal Health Plan ("Client"), 3905 Oberlin Avenue, Lorain, OH 44053.

## R E C I T A L S

A.    MMO has created a network of health care providers (MMO's Network) by entering into agreements with hospitals, physicians, and ancillary and other facilities ("MMO Providers") to provide health care services to cardholders and their dependents ("Covered Persons") covered by health services benefit programs ("Benefit Programs").

B.    A portion of the health care providers in MMO's Networks have entered into SuperMed contracts which provide for services to Covered Persons with SuperMed Benefit Programs based upon certain financial incentives (SuperMed Providers).

C.    Client issues and/or administers Benefit Programs for its Covered Persons.

D.    Client seeks access to MMO's Network as described herein.

E.    Client employs a third-party claims payor ("Claims Payor") to administer its Benefit Program.

## A G R E E M E N T

**Section I.     Term**

1.    This Agreement is effective as of August 1, 2004.

2.    Unless terminated under Section V herein, this Agreement will remain in effect until July 31, 2005 and will be renewed automatically for successive one year terms without further action by either party, unless either party notifies the other party in writing, not less than ninety (90) days before any renewal date, of its intention not to renew this Agreement.

**Section II.     Obligations and Rights of MMO**

1.    Network Recruitment and Contracting. MMO will recruit and contract with MMO Providers which MMO deems sufficient in number and distribution to provide health care services to Covered Persons in Ohio. MMO will generally contract directly with MMO Providers but may also contract with existing networks in certain circumstances whenever, in its sole discretion, MMO determines this to be preferable. MMO retains the right to modify, alter or amend provider fee schedules, payment rates and payment methodologies consistent with its provider contracts.


PLAINTIFF'S EXHIBIT

2. <u>Client Implementation Guide</u>. MMO will issue a Client Implementation Guide (CIG) describing various network matters, and the CIG as amended from time to time, is incorporated into this Agreement in full.

3. <u>Credentialing</u>. MMO will credential MMO Providers in a manner which, in MMO's sole discretion, is consistent with good credentialing practices and procedures.

4. <u>Directories</u>. MMO will provide Client with a list of MMO Providers. Furthermore MMO will provide a toll free telephone number for use by Client and its Covered Persons to determine whether a provider is in MMO's Networks and will maintain an Internet site with a listing of MMO Providers.

5. <u>Claims Receipt and Pricing</u>. MMO will receive directly from all Providers all claims with dates of service on or after the effective date for each Covered Person in either paper or electronic format. As more fully described in the CIG, MMO will return to Client instructions relating to pricing of such claims. In no event will MMO be responsible for paying any portion of any claim. MMO acknowledges and agrees that Client retains the express right to audit bills for non-rendered services and/or duplicate billings.

6. <u>Adjustments, Allowances, Incentives and Settlements</u>. In certain cases, MMO may receive adjustments, allowances, incentives or settlements from MMO Providers relating to provider contract issues such as maximum charge increase violations, prompt payment discounts, or guaranteed discounts corridors. Such adjustments, allowances, incentives and settlements, other than those that accrue to a specific claim at the time of adjudication, shall be the sole property of MMO and shall not reduce or alter in any way the Access Fees paid by Client.

7. <u>Prohibition of Balance Billing</u>. MMO represents and warrants that its contracts with MMO Providers require those providers to refrain from balance billing Covered Persons except for copayments, coinsurance, deductibles and non-covered services consistent with the applicable Benefit Programs. In the event that Client does not elect to have MMO apply its automated payment and medical necessity edits, the aforementioned hold harmless provisions of MMO's provider contracts will not limit billing by MMO Providers in case of medical necessity, or similar, medical policy determinations.

8. <u>Licenses and Registrations</u>. MMO will maintain all licenses, registrations and other government approvals that may be required in connection with its obligations under this Agreement.

9. <u>Insurance</u>. MMO will maintain commercial general liability coverage in the amount of One Million Dollars ($1,000,000.00).

2

10.     Runout. For a one-year period, MMO will price claims even after termination of this Agreement for claims with dates of service between the effective date and the termination date. The Access Fee for such runout pricing is set forth in Exhibit A.

**Section III.     Obligations and Rights of Client**

1.     Eligibility. Client will be solely responsible for making all determinations regarding eligibility for and compensability of benefits in connection with this Agreement. Client will forward to MMO eligibility data as more fully described in the CIG.

2.     Payment to Providers. Client will be solely responsible for making all payments to MMO Providers for Covered Services rendered. All such payments must be made in accordance with applicable state and federal law and must be consistent with the pricing instructions supplied by MMO, except as provided in the CIG. If Client fails to pay a claim as required above, MMO may elect, at its sole discretion, to require Client to pay full charges to the MMO Provider or to suspend repricing of claims. Client acknowledges and understands that the amount to be paid to MMO Providers may exceed the amount of charges for the services rendered. MMO acknowledges and agrees that Client retains the express right to audit bills for non-rendered services and/or duplicate billings.

3.     Notice of Payment. As set forth in the CIG, Client will issue a Notice of Payment (NOP) to each MMO Provider for each claim repriced under this Agreement.

4.     Identification Cards, Directories and Other Materials. Client will issue to all Covered Persons identification cards clearly showing MMO's name and logo provided that any use of MMO's name or logo must be in strict conformance with MMO's graphic standards as described in the Administrative Manual. Client will provide MMO with samples of identification cards for MMO approval. Furthermore, Client will distribute directories and/or MMO network locator information to Covered Persons in conformity with the CIG. Client may also issue other materials, such as marketing brochures, manuals or flyers, but Client must obtain prior approval from MMO before distributing any such materials containing MMO's name, marks or logos.

5.     Financial Incentives to Covered Persons. Client will require that all Sub-Clients provide Covered Persons with financial incentives to utilize SuperMed Providers. This financial incentive will be at least a ten percent (10%) difference in deductible, copayment or coinsurance such that the non-network out-of-pocket maximums encourage the use of MMO's Network. A $500.00 differential between network and non-network out-of-pocket maximum is required. In case of any failure by Client to enforce these financial incentives, MMO may elect, at its sole discretion, to require Client to pay full charges to the MMO Provider.

3

6.  Access Fees.  Client will pay to MMO monthly access fees as set forth in Exhibit A. Such access fees will be paid within fifteen (15) days of the end of the month for which a fee is due.  Interest of two percent (2%) per month will apply to late access fee payments.  In addition, Client will pay MMO all expenses incurred by MMO in connection with collecting such fees, including attorney fees, irrespective of whether suit is filed.  If Client fails to make timely payment of access fees, MMO, at its sole discretion, may suspend repricing until full payment is made by Client.

7.  Data Provision.

  a.  Upon request and at no charge, Client shall provide MMO, all information reasonably necessary to implement, operate, and evaluate the services provided pursuant to this Agreement including, but not limited to, the names and locations of all Sub-Clients accessing MMO's Networks or acting as payor pursuant to this Agreement, the number, and geographic distribution of all Covered Persons.

  b.  On a weekly basis, Client will provide MMO with a disbursements file in EDI format (in the form specified in the CIG), or other mutually agreeable format.

  c.  Upon request and at no charge, Client will provide MMO with a status report as to any claim(s) processed under this Agreement.

8.  Communication with MMO Providers.  With respect to Sub-Clients accessing MMO's Network, Client will not solicit, nor allow any third party on its behalf to solicit, any MMO Providers to contract with Client or to otherwise provide health care services to Covered Persons during the term of this Agreement and for a period of two years thereafter.  With the exception of non-covered services and/or duplicate billing issues, Client will not communicate with MMO Providers regarding pricing of claims nor have any third party do so.  Client will assist MMO in resolving issues with MMO Providers as requested by MMO.

9.  Licenses and Registrations.  Client will maintain all licenses, registrations and other government approvals that may be required in connection with its obligations under this Agreement.

10.  Exclusive Network.  Sub-groups of Client will not use any other network in Ohio for Covered Persons utilizing the MMO Network.  MMO understands and acknowledges that Client is an association plan and as such utilizes several networks.

4

11. <u>Claims Payor</u>. Client has designated Commerce Group Southeast, LLC as the Claims Payor. Client retains the right, throughout the course of this Agreement, to change the Claims Payor designation. Any such change in Claims Payor will be presented to MMO for approval sixty (60) days in advance of the effective date of the proposed change. MMO will indicate its approval or disapproval of any Claims Payor designation within ten (10) working days of receipt of such change notice.

**Section IV. Mutual Obligations and Rights of the Parties**

1. <u>Records and Audit</u>. Each party shall maintain complete and accurate records in connection with this Agreement. Subject to confidentiality provisions contained herein, each party will have the right, upon ten business days' written notice, during normal business hours and at no charge, to perform one audit in each contract year of such records of the other party to confirm the performance of the obligations imposed by this Agreement. The auditing party shall provide the other with a copy of its audit report. The rights set forth in this provision shall survive the termination of this Agreement for one year.

2. <u>Confidentiality</u>. The parties agree to hold all information provided by one party to the other exchanged in contemplation of, or in connection with duties under this Agreement, confidential for the term of this Agreement, and for five years thereafter, and shall not disclose such information to any third party except as required to implement this Agreement, as required by law or regulation, or with the prior written permission of the other party. Nothing herein will be construed to prohibit Client's disclosure of aggregate payment and utilization data to any existing or prospective insurer or third-party administrator for the purpose of facilitating a proposal from such insurer or TPA to insure or administer Client's health benefits.

3. <u>Cross Indemnification</u>. Each party shall indemnify and hold the other, including its officers, trustees, directors, cardholders, agents, successors and assigns, harmless from and against all claims, liability, loss, damages, and expenses, including reasonable attorneys= fees, which may be alleged against or incurred by the other party and which are the result of breach of this Agreement or proximately caused by the negligent omission or commission of the indemnifying party in connection with any obligation set forth in this Agreement.

**Section V. Termination.** Notwithstanding any other provision in this Agreement:

1. If Client does not make payment of the Access Fee in accordance with Section III (6) and is in arrears more than thirty (30) days, MMO may suspend repricing or terminate this Agreement upon written notice.

5

2.  In the event that Client fails to make payment to MMO Providers as required herein, MMO may terminate this Agreement upon written notice.

3.  In the event of a merger, consolidation, sale or other transfer of substantially all of Client's assets or any other change in control of Client, MMO may terminate this Agreement upon written notice.

4.  In the event of a material breach of its obligations under this Agreement (other than a breach relating to payment as described in Section V(1) and (2) above), the non-breaching party shall give the breaching party thirty (30) days to cure. In the event the breaching party fails to cure the breach within the thirty (30) day period, this Agreement may be terminated by the non-breaching party upon sixty (60) days written notice.

5.  If either party becomes insolvent, is adjudicated as bankrupt, makes a general assignment for the benefit of creditors or comes under the control of a trustee in bankruptcy, this Agreement will automatically terminate.

6.  In the event of a termination, each party will promptly pay to the other any money due under this Agreement. Client promptly shall advise Covered Persons of the termination of this Agreement, and shall withdraw from Covered Persons all identification cards bearing MMO's name and logo. Client also shall immediately cease to otherwise use MMO's name and logo.

**Section VI.  Miscellaneous**

1.  <u>Notices</u>. Any notice required pursuant to this Agreement must be in writing and sent by registered or certified mail, return receipt requested, by facsimile transmission with proof of delivery, or by nationally recognized private overnight courier with proof of delivery, to the addresses of the parties set forth below. The date of notice will be the date on which the recipient receives notice or refuses delivery. All notices will be addressed as follows or to such other address as a party may identify in a notice to the other party:

    to MMO:  Medical Mutual of Ohio
    2060 East Ninth Street
    Cleveland, Ohio 44115
    Attn: Vice President, Health Care Finance and
    Network Management
    cc: General Counsel

6

|  | |
|---|---|
| to Client: | South Lorain Merchants Association Health & Welfare Benefit Trust<br>Attn: Sandra L. Kaiser<br>3905 Oberlin Avenue<br>Lorain, OH  44053 |

2.   <u>Relationship of the Parties</u>.   The relationship between the parties is that of independent contractors.  Nothing herein is intended or will be construed to establish any agency, employment, partnership or joint venture relationship between the parties.   Each party will be solely responsible for the direction, control and management of its subcontractors, agents and employees.

3.   <u>Sole Beneficiaries</u>.  Unless otherwise stated herein, this Agreement is entered into by and between MMO and Client solely for their benefit.  The parties have not created or established any third party beneficiary status or rights in any person or entity not a party hereto including, but not limited to, any Covered Person, subcontractor, or other third party, and no such third party will be entitled to enforce any right or enjoy any benefit created or established under this Agreement.

4.   <u>Amendments</u>.  This Agreement may be amended only by mutual written agreement between the parties.

5.   <u>Governing Law and Jurisdiction</u>.  This Agreement is made in, and will be governed by and construed in accordance with the laws of, the State of Ohio without regard to principles of conflict of law.  The state and federal courts located in Ohio will have exclusive jurisdiction over both parties with respect to any dispute regarding this Agreement.

6.   <u>Assignment</u>.   Neither party may assign this Agreement or any of its rights or obligations hereunder to any other person or entity without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld.  This Agreement shall be binding upon and inure to the benefit of the respective parties and their successors and permitted assigns.

7.   <u>Entire Agreement</u>.   This Agreement including any exhibits, attachments and amendments hereto, constitutes the entire agreement between the parties and supersedes any prior agreements or understandings, whether oral or written.

8.   <u>Headings</u>.  The section and paragraph headings used herein are for convenience only and will not be deemed to limit, define or restrict the meaning or content thereof.

7

9.   <u>Waiver</u>. A waiver of a breach or default under this Agreement will not be a waiver of any other subsequent breach or default. A failure or delay in enforcing compliance with any term or condition of this Agreement will not constitute a waiver of such term or condition unless it is expressly waived in writing.

10.  <u>County Restriction</u>. Client and MMO acknowledge that the three (3) county restriction of Lake, Lorain and Cuyahoga Counties will not apply to the fully insured portion of Client's business.


IN WITNESS WHEREOF, the duly authorized representatives of the parties have executed this Agreement below.


MEDICAL MUTUAL OF OHIO

By: _Kent W. Clapp_____

Title: _Chairman, President_
         _& CEO_

Date: _9-22-04_____

SOUTH      LORAIN      MERCHANTS
ASSOCIATION HEALTH & WELFARE
BENEFIT TRUST dba Cardinal Health Plan

By: _Sandra L Kacur____

Title: _Trustee_____

Date: _9-15-04_____


8

## MEDICAL MUTUAL OF OHIO
### NETWORK ACCESS FEES

A. **Network Access Fee**

    1. $3.50 per employee per month (PEPM) plus twenty percent (20%) of savings, as defined in the CIG, in excess of the first fifteen percent (15%) of savings.

B. **Runout Access Fee**

    1. Twenty-five (25) percent of savings, as defined in the CIG.

**EXHIBIT A**